UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

NAKAI LAMAR,
    a/k/a "Love,"
CHAGO HAYNES, and
TYRONE MEACHEM,

                 Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___8|7|15___

**MEMORANDUM
OPINION & ORDER**

14 Cr. 726 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Defendants Nakai Lamar, a/k/a "Love," Chago Haynes, and Tyrone Meachem are

charged with (1) conspiring to distribute heroin and cocaine, in violation of 21 U.S.C. § 846; (2)

conspiring to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951; and (3) possession of

a firearm during a drug trafficking crime and a crime of violence, in violation of 18 U.S.C. §§

924(c)(1)(A)(i) and 2. (Indictment (Dkt. No. 9)) This prosecution arises from a "reverse" or

"sting" investigation in which a cooperating witness working for the Drug Enforcement

Administration ("DEA") approached Defendant Lamar about his interest in robbing drug dealers

who were purportedly shipping cocaine from Miami to New York. (Cmplt. (Dkt. No. 1) ¶ 10)

The drug dealers described by the cooperating witness were fictional.

        Pending before the Court is Defendants' motion to compel the Government to

produce extensive information regarding other sting operations over the past ten years that have

been conducted by the DEA's New York Office and the United States Attorney's Office for the

Southern District of New York ("USAO"). See Dkt. Nos. 28, 30. Defendants contend that the

DEA and the USAO have unfairly targeted "non-white people" for Hobbs Act robbery sting operations, and allege that they were targeted as a result of this discriminatory practice. Defendants seek this discovery in connection with a planned motion to dismiss the Indictment on grounds of selective enforcement in violation of the Fifth Amendment's Equal Protection Clause. See Def. Reply Br. (Dkt. No. 34) at 7[1] ("the thrust of [Defendants'] claim is that they were selectively <u>targeted</u> in the first instance because of their race") (emphasis in original); Transcript of July 8, 2015 proceedings ("Tr.") (Dkt. No. 47) at 11 ("[I]t is absolutely correct . . . that our claim is essentially a selective enforcement claim."). For the reasons stated below, Defendants' motion to compel will be denied.

## BACKGROUND

### I.   THE CRIMINAL COMPLAINT

The criminal complaint in this case – which was sworn to by DEA Special Agent Todd Riley – alleges that in September 2014 a cooperating witness ("CW") told agents about a man he knew a man named "Love" who commits robberies, sells crack cocaine and marijuana, and has access to guns. (Cmplt. (Dkt. No. 1) ¶ 8) The CW provided agents with a telephone number for "Love," who was later identified as Defendant Lamar. (Id. ¶¶ 8, 10(a)) At the direction of the DEA, the CW made a series of recorded telephone calls to Lamar, during which the CW set up a meeting with Lamar to discuss robbing drug dealers who were purportedly shipping drugs from Miami to New York. (Id. ¶ 9)

On September 23, 2014, the CW and a DEA confidential informant ("CI") met with Lamar and Lamar's associate in the Bronx. (Id. ¶ 10, 10(a)) During this meeting – which

---

[1]  The page numbers referenced in this Order correspond to the page numbers designated by the Electronic Case Filing system.

was recorded by DEA agents – the CW and the CI stated that they had information about cocaine shipments coming to New York from Miami, and that they were looking for someone willing to steal the cocaine from the drug traffickers.  (Id. ¶ 10, 10(b))  Lamar and his associate agreed to commit the robbery, and Lamar told the CW that he and his associate had guns with which to commit the crime.  (Id. ¶ 10(c), (d))

In a series of recorded phone calls later in September 2014, the CW arranged another meeting with Lamar to discuss the cocaine robbery.  (Id. ¶ 11)  On September 26, 2014, the CW and the CI met with Lamar at the same Bronx location.  (Id. ¶ 12)  During this meeting – which was also recorded by DEA agents – Lamar stated that he (1) remained interested in committing the robbery; (2) had a minivan that could be used to commit the crime; (3) would tie up the victims; and (4) would go anywhere in New York City to commit the robbery.  (Id. ¶ 12(b))

In October 2014, DEA agents directed the CW to tell Lamar that the CW expected the cocaine shipment to be arriving shortly in New York City.  (Id. ¶ 13(a))  In a recorded phone conversation, Lamar told the CW that he was ready to commit the robbery and wanted to receive updates about the shipment.  (Id.)  On October 20, 2014, in another recorded phone conversation, Lamar and the CW discussed committing the robbery that night.  Lamar told the CW that he and his crew were ready.  (Id. ¶ 13(b))

Later that day, the CW met with Defendants Lamar, Haynes, and Meachem at the same Bronx location.  (Id. ¶ 14)  DEA agents recorded and conducted surveillance of this meeting.  (Id.)  During the meeting, the CW stated that the targets of the robbery had fourteen kilograms of cocaine and four kilograms of heroin.  (Id. ¶ 14(a))  Lamar, Haynes, and Meachem discussed with the CW where they would go after they committed the robbery to split up the

drugs. (Id.) Lamar stated that he would ride with the CW to the robbery site, while Haynes and Meachem followed in a Nissan Altima that contained guns. (Id. ¶ 14(b))  During the meeting, the CW observed Lamar make a series of hand-to-hand drug sales. (Id. ¶ 14(d))

At the end of the meeting, Lamar stated that he was going to get "those things ready." (Id. ¶ 14(e))  Lamar then walked into a nearby building and emerged a short time later with a bag. (Id.)  Lamar handed the bag to Haynes and instructed him to put it in the Nissan Altima. (Id.)  The CW and Lamar then got into the CW's vehicle, while Haynes and Meachem got into the Nissan Altima. (Id. ¶ 14(f))

The CW and Lamar drove to a location in New York City, while Haynes and Meachem followed in the Nissan Altima. (Id. ¶ 15)  When the two cars arrived at the location, agents surrounded the vehicles and placed Lamar, Haynes, and Meachem under arrest. (Id.)  During a search of the Nissan Altima, agents recovered a loaded .22 caliber handgun and a loaded .32 caliber handgun. (Id.)  Officers also found gloves on both Haynes and Meachem. (Id. ¶ 16)

After receiving Miranda warnings, both Lamar and Meachem waived their rights and made statements.  Lamar told agents that he was in route to commit a robbery of narcotics. (Id. ¶¶ 17-18)  Meachem stated that (1) Lamar had retrieved the two handguns from a building and given them to Haynes; (2) Meachem had gloves so that he would not leave fingerprints; and (3) he knew they were in route to commit a robbery of cocaine. (Id. ¶ 19)

## II.   DEFENDANTS' MOTION TO COMPEL

Defendants move to compel the Government to produce a large amount of highly sensitive information concerning sting operations conducted by the DEA and the USAO in this District over the past ten years. (Def. Br. (Dkt. No. 30) at 2-3)  Defendants seek:

- a "list of all reverse-sting cases – and the race of each defendant charged in those cases – involving alleged Hobbs Act robberies of supposedly large narcotics stashes ("phony-stash cases") brought by the United States Attorney's Office for the Southern District of New York . . . , where the DEA was the federal investigating agency, during the last 10 years";

- "[f]or each phony-stash case, a statement of the prior criminal investigations, if any, that the DEA had conducted into each defendant before initiating the reverse sting";

- "[a]ll national and New York Divisions of the DEA manuals, circulars, field notes, correspondence, or any other material which discusses 'stings,' 'reverse stings,' 'phony-stash ripoffs,' or entrapment operations, including protocols and/or directions to agents and confidential informants regarding how to conduct such operations, how to determine which persons to pursue as potential targets or ultimate defendants, whether an attempt to disengage by a prospective co-conspirator is timely and whether that prospective co-conspirator can be or should be dissuaded from disengaging, and how to ensure that agents are not targeting persons for such operations on the basis of their race, color, ancestry, or national origin";

- "[a]ll documents containing information on how supervisors and managers of the New York DEA were to ensure and/or did ensure that their agents were not targeting persons on the basis of their race, color, ancestry, or national origin for these phony-stash cases, and what actions those supervisors and managers took to determine whether agents were in fact targeting persons for those reasons";

- "[t]he number of confidential informants that the New York DEA has used in phony-stash cases each year during the last 10 years and the number of those confidential informants that had access to non-African-American or non-Hispanic persons who could be targeted for a phony-stash case";

- "[d]iscovery from and other information pertaining to phony-stash cases where the USAO or the New York DEA targeted non-African-American or non-Hispanic persons"; and

- "[a]ll documents that contain information about actions taken during the last 10 years by the USAO to ensure that defendants in phony-stash cases brought by the USAO had not been targeted due to their race, color, ancestry, or national origin."

(Id.) Defendants seek production of this material in connection with a planned motion to dismiss

the Indictment on the basis of selective enforcement in violation of the Equal Protection Clause

of the Fifth Amendment.[2] See Def. Reply Br. (Dkt. No. 34) at 7.

---

[2] At the July 8, 2015 oral argument concerning their motion to compel, Defendants reserved the right to later argue that the Indictment should also be dismissed on grounds of selective

III.     **LEGAL STANDARDS**

A.     **Nature of Selective Enforcement Claims**

"[T]he [Fifth Amendment to the] Constitution prohibits selective enforcement of the law based on considerations such as race." Whren v. United States, 517 U.S. 806, 813 (1996). In contrast to a "selective-prosecution claim[, which] is . . . [an] assertion [by a defendant] that the prosecutor has brought the charge for reasons forbidden by the Constitution," United States v. Armstrong, 517 U.S. 456, 463 (1996), a selective enforcement claim is a "grievance . . . directed solely at [police or agent] misconduct." Davis v. Malitzki, 451 F. App'x 228, 234 n.11 (3d Cir. 2011); see also United States v. Barlow, 310 F.3d 1007, 1010 (7th Cir. 2002) ("[Defendant] complains not of selective prosecution, but of racial profiling, a selective law enforcement tactic. . . . [Defendant] contended that the DEA agents had enforced the law selectively by choosing to approach, interview, and search African Americans but not Caucasians, i.e., by engaging in racial profiling.").

Here, Defendants allege misconduct by agents – i.e., they allege that the DEA's New York Office improperly targets non-white individuals in conducting Hobbs Act robbery sting operations. See Def. Reply Br. (Dkt. No. 34) at 7-9. Accordingly, "Defendants' racial profiling claim is essentially a selective enforcement claim, instead of a selective prosecution claim." United States v. Paxton, No. 13 Cr. 103, 2014 WL 1648746, at *3 and n.4 (N.D. Ill. Apr. 17, 2014) (noting that "[D]efendants' racial profiling claim is essentially a selective enforcement claim, instead of a selective prosecution claim," where defendants sought "discovery regarding

_____

prosecution. (Tr. (Dkt. No. 47) at 11)  Defendants contend that "a selective-prosecution challenge may lie" "should the requested discovery reveal that white people were in fact targeted by the DEA for phony-stash cases but then subsequently nor prosecuted by the [USAO], or that the USAO maintained inadequate safeguards to ensure that phony-stash defendants had not been targeted for unconstitutional reasons." (Def. Reply Br. (Dkt. No. 34) at 9 n.3)

the ATF's investigation of phony stash house robberies and the government's subsequent

prosecution of these inchoate crimes").

        To make out a claim of selective enforcement, a defendant must "prove[] that '(1)

the [defendant], compared with others similarly situated, was selectively treated; and (2) that

such selective treatment was based on impermissible considerations such as race. . . .'" Brown v.

City of Syracuse, 673 F.3d 141, 151-52 (2d Cir. 2012) (quoting Diesel v. Town of Lewisboro,

232 F.3d 92, 103 (2d Cir. 2000)); see also Bennett v. City of Eastpointe, 410 F.3d 810, 818 (6th

Cir. 2005) ("The plaintiffs' claim here is one of selective enforcement, and therefore, they must

establish that the challenged police action 'had a discriminatory effect and that it was motivated

by a discriminatory purpose.'") (quoting Wayte v. United States, 470 U.S. 598, 608 (1985)).

"Under the first prong, [a defendant] must demonstrate that [he was] 'treated differently from

other similarly situated [individuals].'" J.E. ex rel. Edwards v. Ctr. Moriches Union Free Sch.

Dist., 898 F. Supp. 2d 516, 547 (E.D.N.Y. 2012) (quoting Cine Sk8, Inc. v. Town of Henrietta,

507 F.3d 778, 791 (2d Cir. 2007)).

    **B.**    **Standard for Obtaining Discovery
            Concerning a Selective Enforcement Claim**

        In United States v. Armstrong, 517 U.S. 456 (1996), the Supreme Court held that

a defendant seeking to obtain discovery on a selective prosecution claim must set forth "'some

evidence tending to show the existence of the essential elements of the [selective prosecution]

defense,' discriminatory effect and discriminatory intent." Armstrong, 517 U.S. at 468 (quoting

United States v. Berrios, 501 F.2d 1207, 1211 (2d Cir. 1974)). That showing must include

"some evidence that similarly situated defendants of other races could have been prosecuted, but

were not." Id. at 469. "The Court did not decide the question of what showing of discriminatory

7

intent sufficed to support discovery." United States v. Alameh, 341 F.3d 167, 174 (2d Cir. 2003).

"Although . . . the Supreme Court . . . [has not] articulated a framework for evaluating the sufficiency of a motion for . . . discovery on a selective enforcement claim under the Equal Protection Clause, [several] Circuits have in such cases . . . applied the standard set forth by the Supreme Court in United States v. Armstrong . . . regarding the showing necessary to obtain discovery on a claim of selective prosecution." United States v. Dixon, 486 F. Supp. 2d 40, 44-45 (D.D.C. 2007) (citing United States v. Alcarez-Arellano, 441 F.3d 1252, 1264-65 (10th Cir. 2006); United States v. Barlow, 310 F.3d 1007, 1010-12 (7th Cir. 2002)); see also United States v. Viera, No. 14 CR. 83 (ER), 2015 WL 3833797, at *2 n.4 (S.D.N.Y. June 19, 2015) ("'for discovery purposes, [selective enforcement and selective prosecution claims] are analyzed under the same legal standard'"); United States v. Cousins, No. 12 Cr. 865, 2014 WL 5023485, at *2 (N.D. Ill. Oct. 7, 2014) ("Although Armstrong dealt only with a selective prosecution claim, a defendant seeking discovery on a selective enforcement claim also must make the showing Armstrong requires.") (citing Barlow, 310 F.3d at 1010). Accordingly, "'a defendant seeking discovery on a selective enforcement claim must meet the same ordinary equal protection standards that Armstrong outlines for selective prosecution claims.'"[3] Dixon, 486 F. Supp. 2d at 45 (quoting Barlow, 310 F.3d at 1010) (internal quotation marks omitted).

---

[3] In a recent decision, the Seventh Circuit discussed the differences between a selective prosecution and a selective enforcement claim. United States v. Davis, No. 14-1124, 2015 WL 4197601, at *7-8 (7th Cir. July 13, 2015). The court explained that "Armstrong was about prosecutorial discretion," and that "[i]n order to give a measure of protection (and confidentiality) to the Executive Branch's deliberative processes, which are covered by strong privileges, the Court in Armstrong insisted that the defendant produce evidence that persons of a different race, but otherwise comparable in criminal behavior, were presented to the United States Attorney for prosecution, but that prosecution was declined." Id. at *7 (citations omitted). The Seventh Circuit then noted that, unlike prosecutors, "[a]gents of the ATF and FBI are not

protected by a powerful privilege or covered by a presumption of constitutional behavior." Id. at *8. The Seventh Circuit concluded that, because of these differences, "the sort of considerations that led to the outcome in Armstrong do not apply to a contention that agents of the FBI or ATF engaged in racial discrimination when selecting targets for sting operations, or when deciding which suspects to refer for prosecution." Id.

The Seventh Circuit did not set forth a separate standard for obtaining discovery concerning a selective enforcement claim, however, nor did it address – much less explicitly overrule – its holding in Barlow that "a defendant seeking discovery on a selective enforcement claim must meet the same 'ordinary equal protection standards' that Armstrong outlines for selective prosecution claims." See id.; Barlow, 310 F.3d at 1010 (citations omitted). Instead, the Seventh Circuit concluded that the discovery order entered by the district court – which required production of discovery material similar to that sought here – was "vastly overbroad," because "[a] good deal of the discovery it requires is blocked by Armstrong" or by "executive privilege independent of Armstrong." Id. at *9-10.

The court noted, however, that "some of the discovery asks for information from supervisors or case agents of the FBI and ATF, and this is outside the scope of Armstrong, the executive privilege, and the deliberative process privilege." Id. at *10. The court went on to state that the "racial disproportion in stash-house prosecutions remains troubling, . . . and it is a legitimate reason for discovery provided that the district court does not transgress Armstrong or an applicable privilege." Id.

The Seventh Circuit did not specify what discovery was appropriate, however, and instead merely vacated the district court's order and ordered the lower court to receive additional evidence from the defendants "and then decide whether to make limited inquiries":

> Instead of starting with a blunderbuss order, a district court should proceed in measured steps. Logically the first question is whether there is any reason to believe that race played a role in the investigation of [the] defendants. The prosecutor says that it cannot have done, because [Davis, one of the defendants,] himself initiated matters by pestering the informant for robbery opportunities and then chose his own comrades. Still, it remains possible that the FBI and the ATF would not have pursued this investigation had Davis been white. Defendants contend that they have additional evidence (beyond that presented to the district court) that could support such a conclusion. The judge should receive this evidence and then decide whether to make limited inquiries, perhaps including affidavits or testimony of the case agents, to determine whether forbidden selectivity occurred or plausibly could have occurred. If not, there would not be a basis to attribute this prosecution to the defendants' race, and the district court could turn to the substance of the charges. If the initial inquiry gives the judge reason to think that suspects of another race, and otherwise similarly situated, would not have been offered the opportunity for a stash-house robbery, it might be appropriate to require the FBI and ATF to disclose, in confidence, their criteria for stash-house stings.

Id. at *10-11.

9

To show discriminatory effect under the <u>Armstrong</u> standard, a defendant seeking discovery on a selective enforcement claim "must make a 'credible showing' that 'similarly situated individuals of a different race were not [targeted].'" <u>United States v. Bass</u>, 536 U.S. 862, 863 (2002) (quoting <u>Armstrong</u>, 517 U.S. at 465, 470). The Seventh Circuit has stated that "[a]lthough statistics alone rarely establish an equal protection violation, they may be sufficient to establish the discriminatory effect prong of the <u>Armstrong</u> test." <u>Barlow</u>, 310 F.3d at 1011 (citing <u>Chavez v. Illinois State Police</u>, 251 F.3d 612, 640 (7th Cir. 2001)). The court noted, however, that "such statistics must be relevant and reliable." <u>Id.</u> "[R]aw statistics regarding overall charges say nothing about charges brought against <u>similarly situated defendants</u>." <u>Bass</u>, 536 U.S. at 863-64 (holding that defendant was not entitled to discovery on a selective prosecution claim where he merely presented "nationwide statistics demonstrating that '[t]he United States charges blacks with a death-eligible offense more than twice as often as it charges whites' and that the United States enters into plea bargains more frequently with whites than it does with blacks") (citation omitted) (emphasis in original).

As to the evidence of discriminatory intent necessary to support a request for discovery, the Second Circuit has acknowledged that "[t]he Court [in <u>Armstrong</u>] did not decide the question of what showing of discriminatory intent sufficed to support discovery," <u>Alameh</u>, 341 F.3d at 174. It is clear, however, that a defendant must at least produce "some evidence" of discriminatory intent. <u>See Bass</u>, 536 U.S. at 863; <u>Alameh</u>, 341 F.3d at 173. And

_____

Given that (1) a number of circuit courts – as well as least one court in this district – have held that a defendant seeking discovery on a selective enforcement claim must meet the <u>Armstrong</u> standards, and (2) <u>Davis</u> does not set forth a clear alternative standard for obtaining discovery on a selective enforcement claim, this Court will follow those decisions holding that the <u>Armstrong</u> standards apply to such a claim. <u>See Alcarez-Arellano</u>, 441 F.3d at 1264-65; <u>Barlow</u>, 310 F.3d at 1010-12; <u>Viera</u>, 2015 WL 3833797, at *2 n.4; <u>see also Dixon</u>, 486 F. Supp. at 45.

"'[d]iscriminatory purpose implies more than intent as awareness of consequences. It implies that the decision maker selected or reaffirmed a particular course of action [at] least in part because of, not merely in spite of, its adverse effects upon an identifiable group.'" Viera, 2015 WL 3833797, at *4 (quoting Wayte, 470 U.S. at 610). Moreover, a defendant must "provide . . . evidence of discriminatory intent specific to [his] case." Id. (citing United States v. Barnes, 532 F. Supp. 2d 625, 637 (S.D.N.Y. 2008)) (emphasis omitted). That is, "to establish the discriminatory intent element in support of a request for discovery on a selective [enforcement] claim, a defendant must produce some evidence that 'the decisionmakers in his case acted with discriminatory purpose.'" Barnes, 532 F. Supp. 2d at 637 (quoting McCleskey v. Kemp, 481 U.S. 279, 292 (1987)) (emphasis in Barnes); see also Cousins, 2014 WL 5023485, at *5 ("To establish discriminatory intent, [a defendant] must show that the 'decisionmakers in [his] case acted with discriminatory purpose.'") (quoting Chavez, 251 F.3d at 645).

## IV.    ALLEGED EVIDENCE OF DISCRIMINATORY EFFECT AND DISCRIMINATORY INTENT

Defendants offer the following evidence in support of their motion to compel.

### A.    Other DEA Hobbs Act Robbery Sting Cases in this District

Defendants cite eighteen Hobbs Act robbery sting cases that were investigated by the DEA and prosecuted in the Southern District of New York since 2013. According to Defendants, none of the 95 defendants in those cases are white. (Marvinny Decl. (Dkt. No. 29) ¶¶ 11-12; see also id., Ex. C)

### B.    Census Data

Defendants also cite 2010 census data showing that – of the 2,970,981 residents in Manhattan and the Bronx – 30.7% are white; 20.9% are black; and 38.5% are Hispanic. (Marvinny Decl. (Dkt. No. 29) ¶ 19) Estimated census data from 2013 also shows that the

11

percentage of white residents in Westchester is 55.7%; in Orange 57.2%; in Rockland 63.9%; in Dutchess 73.3%; in Sullivan 73.7%; and in Putnam 81.5%.  (Id. ¶ 20)

### C.      Sentencing Commission Data

Defendants also rely on United States Sentencing Commission data showing that, between 2006 and 2012, 10.8% of the individuals sentenced under the Sentencing Guidelines for robbery in the Southern District of New York are white; 33.9% are black; and 52.7% are Hispanic.  (Id. ¶ 21)

### D.      New York State Data

Defendants also cite to data from the New York State Division of Criminal Justice Services showing that, in each year from 2009 until 2013, approximately 5,000 offenders from New York City were convicted of violent felony offenses in New York state court.  (Id. ¶ 22)  In 2013, 3,153 of these defendants were convicted of robbery.  (Id.)  Defendants also rely on New York State Department of Corrections data showing that, as of January 2014, the New York State prison population was 23.8% white, 50% black, and 24.1% Hispanic.  (Id. ¶ 23)

### E.      Kohler-Hausmann Declaration

Defendants have also submitted a declaration from Yale Law School Professor Issa Kohler-Hausmann,[4] who "was asked [by Federal Defenders of New York] to estimate the proportion of males currently living in New York City between the ages of 16 and 49 who have previous New York State felony and violent-felony convictions and who are members of four mutually exclusive and exhaustive racial and ethnic categories:  non-Hispanic white, non-

_____

[4]  Kohler-Hausmann is Associate Professor of Law at Yale Law School and Associate Professor of Sociology at Yale University.  Her "primary research areas are in criminal law, criminal procedure, empirical legal studies, tort law, sociology of law, and legal theory."  (Def. Reply Br. (Dkt. No. 29), Ex. A ¶ 1)

Hispanic black, Hispanic of all races, and 'other.'"[5]  (Def. Reply Br. (Dkt. No. 34), Ex. 1

(Kohler-Hausmann Decl.) ¶ 4)  Kohler-Hausmann estimates that there are approximately

237,786 men with prior felony convictions, and that 8.8% of these individuals are white; 43.6%

are black; 43.9% are Hispanic; and 3.7% are "other."  (Id.)  Based on these figures, Kohler-

Hausmann asserts that the probability of randomly approaching exclusively black and/or

Hispanic individuals as the initial contacts in the eighteen Hobbs Act robbery sting cases cited by

Defendants would be about 9%, and that the probability of randomly approaching 95 exclusively

black and/or Hispanic defendants would be about 0.0003%.  (Id. ¶¶ 7, 9)

    Kohler-Hausmann also estimates that there are approximately 84,870 men

between the ages of 16 and 49 living in New York City who have been convicted of violent

felonies; 7.5% are white; 50% are black; 37.1% are Hispanic; and 5.4% are "other."  (Id. ¶ 4)

Based on these figures, Kohler-Hausmann asserts that the probability of randomly approaching

exclusively black and/or Hispanic individuals as the initial contacts in the eighteen Hobbs Act

robbery sting cases cited by Defendants would be about 8.2%, and that the probability of

randomly selecting 95 exclusively black and/or Hispanic defendants would be about 0.0002%.

(Id. ¶ 10)

   **F.**  **Race-Specific References by a Different**
      **Informant in an Unrelated DEA Case**

    Finally, Defendants assert that, "[i]n at least one phony-stash case in this

district[ – United States v. Terry et al., No. 13 Cr. 87 (CM) –] the DEA's confidential informant

made explicit and frequent references, which were recorded, to the desirability of recruiting

black defendants for the (imaginary) robberies of narcotics stashes."  (Def. Br. (Dkt. No. 30) at

---

[5] "The 'other' category includes Asian, Indian, and all 'other' and 'unknown' racial or ethnic designations."  (Def. Reply Br. (Dkt. No. 34), Ex. 1 (Kohler-Hausmann Decl.) at 2 n.1)

6) The criminal complaint in <u>Terry</u> – which was sworn to by DEA Task Force Officer John Salvitti – alleges that a DEA confidential informant told a DEA agent that he knew an individual named Johnny Terry who had previously engaged in robberies and home invasions.  <u>United States v. Terry et al.</u>, No. 13 Cr. 87 (CM), Cmplt. ¶ 8 (S.D.N.Y. Jan. 25, 2013).  At the direction of the DEA, the confidential informant – equipped with a recording device – approached Terry on January 16, 2013, and told him that he knew of a cocaine deal that would take place either in Washington Heights or in the Bronx.  <u>Id.</u> ¶ 10(a).  Terry told the informant that he was interested in robbing drug dealers, but that he did not want to rob drug dealers in Washington Heights because he "had previously purchased bad cocaine from an individual in Washington Heights . . . , stuck a gun in the [i]ndividual's mouth, and stolen the [i]ndividual's necklace in retaliation, and that there were too many police officers in Washington Heights."  (<u>Id.</u> ¶ 10(b))  The informant and Terry then agreed to rob the purported drug dealers in the Bronx.  (<u>Id.</u> ¶ 10(c))

During the recorded January 16, 2013 meeting, the informant – a Hispanic man – repeatedly references the color of Terry's skin.  <u>See</u> Marvinny Decl. (Dkt. No. 29) ¶ 16, Ex. D. When discussing the robbery plan, for example, the informant says:  "And you black, you know what I'm saying?  It gonna look good."  (<u>Id.</u>, Ex. D at 6)  Terry responds that he will arrange for other, darker-skinned men to commit the robbery:  "I'ma let them niggas do it.  They darker than me, they look worse."  (<u>Id.</u>)  Later in the conversation, the informant asks whether the other individuals that Terry has recruited are "dark-skinned."  (<u>Id.</u> at 11)  Terry responds that they are "[b]lack, black."  (<u>Id.</u>)  The informant also says that when he approached Terry about the robbery, "You told me the first time, Yo I get down like this.  Then I thought about you.  I was like, Yo, this guy is black, he's perfect!"  (<u>Id.</u> at 7)  The informant also states that the purported victims will never suspect the informant's involvement, because he "don't know no black

14

people." (Id. at 24)  Defendants also cite to a later meeting between the informant and Terry

during which the informant reports that he told the driver for the robbery that he "got some black

dudes from the Bronx, they say they get down, they do it.  So we was like, Oh, that's beautiful!"

(Marvinny Decl. (Dkt. No. 29), Ex. E at 2)

## DISCUSSION

In at least three recent Hobbs Act robbery sting cases in this District, courts have

denied discovery concerning selective prosecution and/or selective enforcement claims.  In

United States v. Viera, No. 14 Cr. 83 (ER), 2015 WL 3833797 (S.D.N.Y. June 19, 2015), for

example, Judge Ramos denied discovery to the defendants, finding that they had not satisfied

their burden of producing "some evidence" of discriminatory effect and discriminatory intent.

Viera, 2015 WL 3833797, at *3-*5.  The Viera defendants relied on essentially the same

evidence presented to this Court.  Id. at *2.[6]

In United States v. Delacruz, No. 14 Cr. 815 (KBF), 2015 WL 2211943, at *4

(S.D.N.Y. May 12, 2015), Judge Forrest likewise denied the defendant's request for discovery,

finding that he had "produced no . . . evidence – statistical or otherwise" – that (1) "similarly

situated defendants of other races could have been prosecuted, but were not"; and (2) "the

Government was motivated by a discriminatory purpose."  Delacruz, 2015 WL 2211943, at *4

(internal quotation marks and citations omitted).

Similarly, in United States v. Thompson, et al., No. 13 Cr. 378 (AJN), 2013 WL

6246489, at *5 (S.D.N.Y. Dec. 3, 2013), Judge Nathan denied a request for discovery where the

defendant argued that (1) "the overwhelming percentage of minority individuals targeted by the

DEA presents a starkly racially discriminatory picture," and (2) "few if any Caucasians have

---

[6]  The only new evidence that Defendants offer here is the Kohler-Hausmann Declaration.

been investigated and prosecuted by DEA for sham drug dealer robberies." Thompson, 2013

WL 6246489, at *5 (internal quotation marks and citations omitted).  Judge Nathan found that

these "mere 'reported personal conclusions based on anecdotal evidence[]' . . . cannot constitute

evidence of discriminatory effect or discriminatory intent." Id. (quoting Armstrong, 517 U.S. at

470).

Although Defendants' arguments for discovery have been uniformly rejected in

this District, this Court has nonetheless analyzed each category of proffered evidence and

considered whether it constitutes evidence of discriminatory effect or discriminatory intent.

I.    **DEFENDANTS' EVIDENCE**

   A.    **Statistics Concerning Defendants in Hobbs Act**
         **Robbery Sting Cases Prosecuted in this District**

      1.    **Analysis of Complaints Cited by Defendants**

With respect to the eighteen Hobbs Act robbery sting cases prosecuted in this

District since 2013, Defendants argue that the fact that none of the defendants is white

"constitute[s] overwhelming evidence that people of color were unconstitutionally targeted and

prosecuted," and that "[t]hese profoundly troubling statistics demonstrate both discriminatory

effect and intent, and justify the defendants' discovery request."  (Def. Br. (Dkt. No. 30) at 11)

This Court disagrees.  The fact that none of the 95 defendants in these cases is

white does not constitute "some evidence" of either discriminatory effect or discriminatory

intent.  A close review of the complaints in these eighteen cases reveals that 76 of the 95

defendants in these cases were recruited not by a DEA informant, but instead by a co-

conspirator.[7]  Because co-conspirators – and not DEA agents or informants – approached these

---

[7]  In two of the cases, a DEA informant initially approached two individuals, who later recruited
the remaining co-defendants.  See United States v. Concepcion, et al., No. 14 Mag. 1046, Cmplt.

16

76 defendants, it is clear that they were not targeted on the basis of any alleged discriminatory policy or practice of the DEA. Accordingly, the race of these 76 defendants sheds no light on the question of whether the DEA's policies have a discriminatory effect, or whether the DEA has acted with discriminatory intent.

As to the nineteen defendants who were initially approached by a DEA informant or cooperating witness, the criminal complaints reveal that ten of these individuals were known by a DEA source – who had previously proven reliable – to have robbed drug dealers in the

---

¶¶ 9(b), 14(d) (S.D.N.Y. May 14, 2014); United States v. Cabrera et al., No. 15 Mag. 280, Cmplt. ¶¶ 8-9, 12-14 (S.D.N.Y. Jan. 30, 2015). In one of the cases, a DEA cooperating witness initially approached an uncharged co-conspirator, that uncharged co-conspirator recruited one of the defendants, and that defendant recruited the remaining defendants. See United States v. Camacho et al., No. 13 Mag. 0065, Cmplt. ¶¶ 8-14, 17-18 (S.D.N.Y. Jan. 10, 2013). In the remaining cases, a DEA informant or cooperating witness initially approached one defendant, who later recruited the remaining co-defendants. See United States v. Terry et al., No. 13 Mag. 00220, Cmplt. ¶¶ 8-13 (S.D.N.Y. Jan. 25, 2013); United States v. Holguin et al., No. 13 Cr. 363, Cmplt. ¶¶ 10-12, 17 (S.D.N.Y. Mar. 21, 2013); United States v. Thompson et al., No. 13 Cr. 378, Cmplt. ¶¶ 10-13, 20 (S.D.N.Y. Apr. 23, 2013); United States v. Rollins et al, No. 13 Cr. 362, Cmplt. ¶¶ 10-13, 15, 19 (S.D.N.Y. May 2, 2013); United States v. Ramires et al., No. 13 Mag. 1347, Cmplt. ¶¶ 9-14, 18 (S.D.N.Y. May 22, 2013); United States v. Brant et al., No. 13 Cr. 487, Cmplt. ¶¶ 10-13, 15-16 (S.D.N.Y. June 12, 2013); United States v. Tajman et al., No. 13 Cr. 531, Cmplt. ¶ 7-8, 10-12 (S.D.N.Y. July 2, 2013); United States v. Cook et al., No. 13 Cr. 777, Cmplt. ¶¶ 10-11 (S.D.N.Y. Sept. 5, 2013); United States v. Davis et al., No. 13 Cr. 987, Cmplt. ¶¶ 10, 12-16 (S.D.N.Y. Nov. 19, 2013); United States v. Viera et al., No. 14 Mag. 0042, Cmplt. ¶¶ 10-11, 13, 15 (S.D.N.Y. 2014); United States v. Gomez et al., No. 14 Mag. 1311, Cmplt. ¶¶ 9, 11-13 (S.D.N.Y. June 11, 2014); United States v. Quiroz et al., No. 14 Mag. 1731, Cmplt. ¶¶ 9-11, 19 (S.D.N.Y. Aug. 7, 2014); United States v. Ortiz et al., No. 14 Mag. 2073, Cmplt. ¶¶ 8-12, 14 (S.D.N.Y. Sept. 17, 2014); United States v. Lamar et al., No. 14 Cr. 726, Cmplt. (Dkt. No. 1) ¶¶ 9-10, 14 (S.D.N.Y. Oct. 21, 2014); United States v. Velez et al., No. 14 Mag. 2569, Cmplt. ¶¶ 8-11, 19-22 (S.D.N.Y. Nov. 14, 2014).

Accordingly, only nineteen of the 95 defendants charged in the eighteen cases cited by Defendants were initially approached by a DEA informant or cooperating witness; the remaining 76 defendants were recruited by the defendant or another individual who was initially approached.

past,[8] while four others told a DEA informant that they had committed robberies and/or home invasions in the past, or committed acts of violence for hire.[9]

_____

[8] See Holguin, No. 13 Cr. 363, Cmplt. ¶ 9 ("the CW told [the DEA agent] . . . that he knew an individual, later identified as ODANIS HOLGUIN . . . who participated in home invasion robberies of drug dealers and had connections to other crews that conducted these robberies"); Thompson, No. 13 Cr. 378, Cmplt. ¶ 9 ("the CW told [the DEA agent] . . . that he knew an individual, later identified as JOHN THOMPSON . . . who participated in home invasion robberies of drug dealers and had connections to crews that conducted these robberies"); Rollins, No. 13 Cr. 362, Cmplt. ¶ 9 ("the CW told [the DEA agent] . . . that he/she knew an individual, later identified as CHRISTOPER ROLLINS, . . . who participated in armed robberies of drug dealers"); Ramires, No. 13 Mag. 1347, Cmplt. ¶ 9 ("the CW called EUDIRYS NUNEZ, the defendant, who was previously known to the CW as part of a crew of individuals who rob narcotics traffickers"); Brant, No. 13 Cr. 487, Cmplt. ¶ 9 ("the CW told [the DEA agent] . . . that the CW knew an individual, later identified as EL-TAHID BRANT, . . . who participated in robberies of drug dealers and was interested in participating in additional such robberies"); Cook, No. 13 Cr. 777, Cmplt. ¶ 9 ("CW-1 provided certain information regarding an individual known to CW-1 as "Ghost" who, according to CW-1, had previously participated in armed robberies of drug dealers . . . [L]aw enforcement agents were able to identify "Ghost" as JOHN WILLIAM COOK, JR., the defendant"); Davis, No. 13 Cr. 987, Cmplt. ¶ 9 ("According [to] CS-1, [the defendant] had indicated that he had a crew that had conducted robberies of drug dealers in the past and that was capable of committing additional robberies of drug dealers in the future."); Viera, No. 14 Mag. 0042, Cmplt. ¶ 9 ("According [to] CW-1, VIERA had previously indicated to CW-1 that he had a crew that had conducted robberies of drug dealers in the past and that was capable of committing additional robberies of drug dealers in the future."); Cabrera, No. 15 Mag. 280, Cmplt. ¶ 8 ("the CI was introduced – later identified as RAFAEL NUNEZ CABRERA and JOSE OFRACIO PEREZ . . . the defendants – who were believed to be members of a robbery crew . . . with experience committing armed robberies of drug dealers").

[9] Terry, No. 13 Mag. 00220, Cmplt. ¶¶ 8(b) ("TERRY told the CI that TERRY had previously engaged in robberies and home invasions"); Gomez, No. 14 Mag. 1311, Cmplt. ¶ 8 ("CW-1 provided information about an individual he knew as HANLEY GOMEZ . . . and reported that GOMEZ had bragged about robberies in the past."); Ortiz, No. 14 Mag. 2073, Cmplt. ¶ 8 ("the CW and the CI obtained the telephone number of [the defendant,] who was reputed to have experience engaging in acts of violence for hire"); Lamar, No. 14 Cr. 726, Cmplt. (Dkt. No. 1) ¶ 8, 10(a) ("[T]he CW told law enforcement, in substance and in part, that (1) s/he knew a man named 'Love,' who commits robberies; (2) 'Love' sells crack cocaine and marijuana; and (3) 'Love' has access to guns. . . . [This] individual [was] later identified as NAKAI LAMAR.").

As to the remaining five defendants, the complaints do not disclose whether the defendant initially approached had previously robbed drug dealers or engaged in other violent robberies. See Velez, No. 14 Mag. 2569, Cmplt. ¶¶ 8-9 ("[A]t the direction of the DEA, the CW and the CS obtained the telephone number of an individual – later identified as ALEX VELEZ . . . – who was reputed to be a large quantity narcotics dealer. . . ."); Tajman, No. 13 Cr. 531, Cmplt. ¶ 7(a) ("[T]he CW, working at the direction of law enforcement, told LAZARO TAJMAN, the defendant, that he was interested in robbing shipments of narcotics by force. TAJMAN told the

As to all nineteen defendants who were initially approached by a DEA source about robbing drug dealers, tape recordings and other evidence confirmed source information indicating that each individual was pre-disposed to rob drug dealers.[10]

---

CW that he could handle the 'job' with his robbery crew. TAJMAN told the CW to keep him updated and gave the CW his phone number."); Concepcion, No. 14 Mag. 1046, Cmplt. ¶¶ 9(a), (b) ("CW-1 made recorded calls to MANUEL CONCEPCION and set up an in person meeting to discuss the potential robbery. . . . [confidential informants later] met with MANUEL CONCEPCION and TOMAS CONCEPCION, the defendants . . . [and] told [them] about a shipment of cocaine and heroin coming from Miami, FL to New York, and asked if they would be interested in robbing the shipment. [The defendants] stated . . . that they were ready, willing, and able to carry out the robbery, and asked to be kept up to date with the details."); Quiroz, No. 14 Mag. 1731, Cmplt. ¶¶ 8-9 ("Since in or about May 2014, the [DEA] Task Force has been investigating a home invasion and armed robbery organization operating in the New York City area, whose members pose as police officers in order to rob narcotics traffickers of either their drugs or the proceeds of their narcotics sales. The Task Force has been assisted in this investigation by two paid sources of information ('SOI-1' and 'SOI-2'). Information provided to date by both SOI-1 and SOI-2 in this investigation has proven reliable, and has been corroborated by other independent means, such as agent surveillance and recorded conversations and meetings. . . . "[I]n or about May 2014, at the direction of law enforcement, SOI-1 spoke by telephone with LUIS HORRACH, . . . the defendant.").

[10] Terry, No. 13 Mag. 00220, Cmplt. ¶ 10(b) ("TERRY told the CI that TERRY would be interested in robbing drug dealers"); Holguin, No. 13 Cr. 363, Cmplt. ¶ 14(b) ("HOLGUIN said that he would be ready to rob the shipment, and would have four or five other people with him to do so. HOLGUIN said that he would be able to sell a portion of the heroin in the area of Boston, Massachusetts."); Thompson, No. 13 Cr. 378, Cmplt. ¶¶ 11(b), (c), (d) ("THOMPSON told the CW that he was interested in conducting the robbery. . . . THOMPSON explained that his robbery crew consisted of members of his family and that one of them had just completed a 17-and-a-half-year term of imprisonment. . . . THOMPSON stated: 'This is what I do. I've done it before.'"); Rollins, No. 13 Cr. 362, Cmplt. ¶ 11(d) ("ROLLINS further explained that robbing drug dealers is what he used to do for a living."); Ramires, No. 13 Mag. 1347, Cmplt. ¶ 9(b) ("NUNEZ told the CW that NUNEZ had a team that could commit the robbery."); Brant, No. 13 Cr. 487, Cmplt. ¶ 10(b) ("BRANT stated that he had done this type of robbery before and that he had his own 'artillery.'"); Tajman, No. 13 Cr. 531, Cmplt. ¶ 7(d) ("TAJMAN explained that he had bulletproof vests and a Mac 10 machine gun, and that his crew was ready to carry out the robbery. TAJMAN also said that he stole drugs for the CW and CS."); Cook, No. 13 Cr. 777, Cmplt. ¶ 10(b) ("During that meeting, which was consensually recorded, COOK bragged about having carried out armed robberies of drug dealers in the past. . . ."); Davis, No. 13 Cr. 987, Cmplt. ¶¶ 10, 12, 13(b) ("DAVIS expressed interest in the plan and, in particular, in having his crew commit the robbery . . . [Co-defendant] CHAPPELLE indicated that he worked with TYRONE DAVIS, the defendant, and would be meeting with CW-1 later that day on DAVIS' behalf to discuss the proposed robbery. . . . During the meeting . . . CHAPPELLE and [co-defendant] BONNER also spoke about prior robberies they had committed, indicating that

In sum, analysis of the eighteen complaints cited by Defendants does not support

their argument that the DEA targeted non-white defendants for participation in Hobbs Act

---

'moving' or re-selling the 10 kilograms of cocaine and two kilograms of heroin they intended to steal wouldn't be a problem."); Viera, No. 14 Mag. 0042, Cmplt. ¶¶ 11(a-b), 13(b) ("VIERA and SANTIAGO expressed interest in robbing the drug dealers with his 'crew.' . . . VIERA and SANTIAGO explained to CW-1 that they could sell CW-1's share of the stolen drugs for him. . . . VIERA and SANTIAGO advised CW-1 and CS-1 that they were ready to proceed with the robbery, and SANTIAGO informed CW-1 and VIERA had committed such robberies in the past."); Gomez, No. 14 Mag. 1311, Cmplt. ¶ 11(e) ("During this conversation, GOMEZ also stated that he had 'put guns to people's heads before,' and that he cooks cocaine into crack for sale."); Concepcion, No. 14 Mag. 1046, Cmplt. ¶ 14(g) ("[Defendants TOMAS CONCEPCION and MANUEL CONCEPCION] assured CW-1 that they had done a robbery before, and that they would call CW-1 and CS-1 after it was done so that they could split up the drugs"); Quiroz, No. 14 Mag. 1731, Cmplt. ¶¶ 11(e), (g) ("QUIROZ and HORRACH explained that, at the time of the cocaine robbery, they would be carrying guns and wearing vests and police badges. . . . QUIROZ and HORRACH assured SOI-1 and SOI-2 that they were 'professionals'"); Ortiz, No. 14 Mag. 2073, Cmplt. ¶¶ 10(b), 14(f) ("JEAN ORTIZ expressed interest in doing the robbery. ORTIZ stated that he had killed before and was willing to kill as part of the robbery if the CW and the CI wanted ORTIZ to do so. . . . JEAN ORTIZ or [co-defendant] IRIZARRY said: (i) that after they steal the cocaine in the robbery, JEAN ORTIZ and IRIZZARY intend to open up new drug spots in Philadelphia to sell drugs; (ii) that JEAN ORTIZ and IRIZARRY had been involved in a turf war with rival drug dealers in Philadelphia in which rivals kept killing IRIZARRY's drug workers; (iii) that JEAN ORTIZ killed two rival drug dealers in Philadelphia; (iv) that JEAN ORTIZ and IRIZARRY currently have two drug selling spots in Philadelphia, one of which was obtained after JEAN ORTIZ shot a rival drug dealer."); Lamar, No. 14 Cr. 726, Cmplt. (Dkt. No. 1) ¶¶ 12(b), 14(c,d) ("LAMAR stated, in substance and in part, that . . . [he] would tie up the victims," and that he "would go anywhere in the five boroughs to commit the robbery. . . . The CW and [Defendants] discussed, in substance and in part, how they would conduct the robbery like a carjacking. . . . The CW observed LAMAR make hand-to-hand drug sales with various unidentified individuals who walked past the meeting."); Velez, No. 14 Mag. 2569, Cmplt. ¶¶ 9(b, d), 13(e) ("VELEZ stated that he knew of two individuals in Philadelphia who would do the job for $1,000 each, and that these two men would grab the drug supplier, put him in a car, and kill him. . . . In response, the CW and the CS clarified that they wanted a drug robbery, not a murder for hire, to which VELEZ responded that he had four men in mind and that he would meet with them as soon as VELEZ returned to Philadelphia. . . . VELEZ discussed a triple shooting in which members of his crew participated in Philadelphia, Pennsylvania, when members of his crew had gotten into an argument with local drug dealers, chased them to a street corner in Philadelphia, and then proceeded to open fire on the victims' black SUV with high powered rifles."); Cabrera, No. 15 Mag. 280, Cmplt. ¶ 9(c) ("CABRERA and PEREZ discussed prior robberies committed by their Robbery Crew. For example, CABRERA and PEREZ spoke about a robbery of two kilograms of heroin that they said they had committed in Queens, New York.").

robbery stings.  Of the non-white 95 defendants in those cases, 76 were recruited by co-
conspirators, and not by any DEA informant or cooperating witness.  As to the remaining
nineteen defendants, most were targeted because they had told a DEA source that they had
robbed drug dealers in the past, or were otherwise known to have robbed drug dealers in the past,
or had committed other violent robberies, including home invasions.

       Defendants concede that "the apparent purpose of the sting reverse operations in
the context of . . . Hobbs Act robbery is to get people off the street who either have robbed drug
dealers in the past or may be likely to do so in the future." (Tr. (Dkt. No. 47) at 21)  In light of
this apparent purpose, it is completely reasonable for the DEA to target individuals who have
said that they have robbed drug dealers in the past, or who were otherwise known to have robbed
drug dealers in the past.

       With respect to the complaint allegations explaining why a particular defendant
was targeted, there is no evidence that any of the allegations in the eighteen complaints are false.
Nor is there any evidence that the DEA instructed informants to target "non-white" people, or
that DEA informants unilaterally chose to discriminate against "non-white" people.  Moreover,
Defendants concede that there is no evidence that the DEA (1) declined to target a white
individual who was identified by a DEA source as someone who had robbed drug dealers in the
past; or (2) communicated to informants and cooperating witnesses that the DEA was only
interested in targeting non-white people for robbery stings.  (Tr. (Dkt. No. 47) 33-35) (admission
that Defendants have no "direct evidence" that (1) "an informant ever told [the DEA agents
involved in this case] about a white person who had robbed drug dealers or who might be
interested in robbing drug dealers, and that [the DEA agents involved in this case] indicated that
they were[ not] interested in pursuing that person"; and (2) the DEA agents involved in this case

"instructed informants that the DEA was only interested in targeting non-white people who robbed drug dealers or might be interested in robbing drug dealers."); see also United States v. Colon, No. 3:14 Cr. 00085 (JAM), 2014 WL 6390566, at *8 (D. Conn. Nov. 17, 2014) ("But there is no evidence that the government did anything to select any of the seven defendants except for the two Colon brothers, who themselves chose their own co-conspirators.  And even as to the Colon brothers, defendants furnish no evidence regarding similarly situated comparators – that is, individuals who were not Hispanic, who had similar prior criminal involvement, and whom the ATF could have targeted but did not.") (citing Armstrong, 517 U.S. at 470).

Under these circumstances, the eighteen Hobbs Act robbery sting cases cited by Defendants do not constitute evidence that DEA policies and practices in robbery sting cases have a discriminatory effect or that DEA acted with a discriminatory intent in this case or any other robbery sting case in this District.

## 2.   Application of *Armstrong* Standards

This conclusion is consistent with the Armstrong standards.  As discussed above, in order to satisfy their burden of producing "some evidence" of discriminatory effect, Defendants "must make a 'credible showing' that 'similarly situated individuals of a different race were not [targeted].'"  Bass, 536 U.S. at 863 (quoting Armstrong, 517 U.S. at 465, 470). Although Defendants have demonstrated that none of the nineteen defendants initially approached in the eighteen Hobbs Act robbery sting cases is white, this data "says nothing about whether the [DEA] . . . chose not to conduct . . . stash-house robbery sting cases for similarly-situated individuals of another race."  Cousins, 2014 WL 5023485, at *4.  "This data suffers from the same infirmity as the data presented in support of the defendants' selective prosecution claim in Armstrong."  United States v. Whitfield, 29 F. Supp. 3d 503, 514 (E.D. Pa. 2014).

In <u>Armstrong</u>, the defendants seeking discovery offered evidence "that, in every one of the 24 [drug] cases closed by the [Office of the Federal Public Defender] during 1991, the defendant was black." <u>Armstrong</u>, 517 U.S. at 459.  The Supreme Court held that this study did not justify discovery concerning defendants' selective prosecution claim, because it "failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents were charged, but were not so prosecuted." <u>Id.</u> at 470.

Defendants argue that <u>Armstrong</u> is not applicable here, because "[i]n the phony-stash context, it is meaningless to say . . . that no white people who 'committed these crimes' were not prosecuted, since the 'crimes' in question were reverse stings fabricated out of thin air by the DEA." (Def. Reply Br. (Dkt. No. 34) at 8 (citation omitted))  Defendants contend that, "[u]nlike the defendants in <u>Armstrong</u>, the defendants in the phony-stash cases were not actively engaged in criminal conduct until they were targeted for a DEA-initiated reverse sting." (<u>Id.</u>)

"While it is true that this case is factually different from <u>Armstrong</u> in ways that impact the manner in which Defendants could be expected to demonstrate the discriminatory effect element of their claim, this factual distinction does not justify relieving Defendants altogether of the burden to show similarly situated defendants of other races were treated differently." <u>Whitfield</u>, 29 F. Supp. 3d at 514 (citing <u>Armstrong</u>, 517 U.S. at 466-67); <u>see also</u> <u>Viera</u>, 2015 WL 3833797, at *3 (citing <u>Whitfield</u>, 29 F. Supp. 3d at 514); <u>Colon</u>, 2014 WL 6390566, at *12 ("To the extent that defendants cite statistics from Connecticut and elsewhere of the number of minority defendants charged in ATF stash-house schemes, these statistics – if reliable – do not cure defendants' failure to adduce evidence of similarly situated comparators.").

Assuming <u>arguendo</u> that statistics "may be sufficient to establish the discriminatory effect prong of the <u>Armstrong</u> test," <u>Barlow</u>, 310 F.3d at 1011 (citation omitted),

23

"'[t]he statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated.'" Whitfield, 29 F. Supp. 3d at 514-15 (quoting Chavez, 251 F.3d at 638). Here, the proffered data sheds no light on the issue of whether the nineteen defendants initially approached in the eighteen robbery sting cases were treated differently from another similarly-situated class. Accordingly, these statistics do not constitute "some evidence" of discriminatory effect under the Armstrong standard.

The racial composition of the defendants in the eighteen robbery sting cases likewise does not, under Armstrong, constitute evidence of discriminatory intent. Although the Second Circuit has explained that a defendant may demonstrate discriminatory purpose "through circumstantial or statistical evidence," Alameh, 341 F.3d at 173 (citing Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)), "a defendant must produce some evidence that 'the decision makers in his case acted with discriminatory purpose.'" Barnes, 532 F. Supp. 2d at 637 (quoting McCleskey, 481 U.S. at 292) (emphasis in Barnes). Defendants have not met this requirement. The race of 76 of the 95 defendants in the unrelated robbery sting cases is irrelevant, because they were not approached by a DEA agent or informant. Moreover, evidence concerning the racial composition of the nineteen remaining defendants in these unrelated cases tells us nothing about the intent of the decision makers in Defendants' case. Accordingly, "even if this [evidence] sufficed as evidence of discriminatory effect – which, as explained above, it does not – it fails to show discriminatory intent." Cousins, 2014 WL 5023485, at *5.

### 3.   *United States v. Paxton* Is Not Persuasive

Defendants also argue that "the statistical data from this district's phony-stash cases is precisely the kind of data the court in United States v. Paxton[, No. 13 Cr. 103, 2014 WL 1648746, at *5 (N.D. Ill. Apr. 17, 2014)] relied upon to grant a similar discovery motion." (Def.

24

Reply Br. (Dkt. No. 34) at 5)  In Paxton, the defendants sought "discovery to support anticipated

claims of racial profiling in the investigation and prosecution of stash house robbery cases."

Paxton, 2014 WL 1648746, at *1.  The defendants

> offer[ed] statistics regarding the racial makeup of the defendants prosecuted in
> th[at] district for stash house robberies to meet [Armstrong's] "some evidence"
> standard.  According to defendants, in the seventeen cases filed since 2006, 42 of
> the 57 defendants are African-American, 8 are Latino, and 7 are white.  In the
> cases filed since 2011, defendants allege[d] that 19 of the 26 defendants are
> African-American, 7 are Latino, and none are white.

Id.

        With respect to the discriminatory effect prong, the Paxton court addressed the

difficulties that defendants face in obtaining discovery on a claim of selective enforcement under

the Armstrong framework:

> Inherent in the Armstrong framework is the assumption that there is a defined
> class of individuals to whom defendants may compare themselves.  As the
> Armstrong court observed, in selective prosecution claims, there should exist
> records of individuals who were charged and then subsequently treated in a
> different manner than the defendant.  In selective enforcement cases, however,
> identifying the class of individuals is a much more burdensome endeavor, and one
> that may prove insurmountable.

Id. at *4.  Noting the Seventh Circuit's statement in Barlow that, "in some cases, statistics alone

may be sufficient to meet the 'some evidence' standard for the discriminatory effect prong," id.

(citing Barlow, 310 F.3d at 1011), the Paxton court concluded that

> defendants have proffered statistics sufficient to meet the 'some evidence'
> requirement under Seventh Circuit precedent. . . .  All of the cases identified by
> defendants have involved undercover operations by ATF agents in circumstances
> largely similar to the instant case.  Further, the statistics appear to be reliable
> because they are corroborated, in part, by the lists of cases provided by the
> government, and there is no assertion that the information collected by defendants
> as to race is inaccurate.

Id. at *5.  The court also noted that "in at least one other case in [the Northern District of Illinois], the government appears to have complied with the district court's order to produce some of the same discovery materials sought in the instant case."[11]  Id.

The Paxton court also announced – in two sentences and with little analysis – that "defendants have made a preliminary showing of discriminatory intent."  Id. at *5.  The court found that

> [t]he defense has demonstrated that no white defendants have been indicted for phony stash house cases since 2009, despite the diverse makeup of the Northern District of Illinois.  Because "the inexorable zero" may be evidence of discriminatory intent, Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886), the court finds that defendants have produced "some evidence" tending to show discriminatory intent.

Id.

---

[11] The "other case" referenced in Paxton is United States v. Brown, et al., No. 12 Cr. 63 (N.D. Ill. filed Sept. 13, 2012).  In Brown, the court concluded in a two-page order that the defendants' data showing that "the overwhelming targets of [phony-stash investigations] were African Americans" was "substantial enough to require the government to provide discovery to the defense on [certain] limited subjects."  Brown, No. 12 Cr. 63, Dkt. No. 153, at 1-2 (N.D. Ill. July 31, 2013).  The Brown court cited no cases in its two-page order.  The judge who issued the decision in Brown issued an identical decision in another case on the same day.  United States v. Williams, et al., No. 12 Cr. 887, Dkt. No. 70 (N.D. Ill. July 31, 2013).  Defendants also cite to United States v. Jackson et al., 13 Cr. 636 (N.D. Ill. Nov. 18, 2014), and United States v. Elias et al., 13 Cr. 476 (N.D. Ill. Dec. 4, 2014), in which courts ordered the same discovery provided in Williams and Brown.  See July 10, 2015 Def. Ltr. (Dkt. No. 46) at 2.  In Jackson, the Clerk of Court made a docket entry stating that "Defendants' motions for discovery . . . are granted in accordance with this Court's oral ruling.  The Government shall turn over documents to defense counsel upon execution of an agreed protective order."  Jackson, et al., 13 Cr. 636, Dkt. No. 100 (N.D. Ill. Nov. 18, 2014).  This minute entry does not indicate the reasoning behind the court's ruling, however, and a transcript of the court's oral ruling is not available on the docket sheet.  See id.  Similarly, in Elias, the Clerk of Court made a docket entry stating that "Defendants' motion for discovery . . . is granted in part and denied in part.  The motion is granted to the same extent Judge Castillo granted a similar motion [in Williams] and denied as to the rest."  Elias, et al., No. 13 Cr. 476, Dkt. No. 272 (N.D. Ill. Dec. 4, 2014).  This minute entry does not indicate the reasoning behind the court's ruling.  See id.  Because Brown, Williams, Jackson, and Elias do not apply the Armstrong framework, this Court will not rely on these cases.

The Paxton court did not apply Armstrong's "rigorous standard for discovery in aid of [a selective enforcement claim]." See Armstrong, 517 U.S. at 468. Although, "in some cases, statistics alone may be sufficient to meet the 'some evidence' standard for [Armstrong's] discriminatory effect prong," Paxton, 2014 WL 1648746, at *4 (citing Barlow, 310 F.3d at 1011), Defendants "cannot meet Armstrong's rigorous standard to obtain discovery" "[w]ithout presenting evidence that similarly situated individuals were not targeted for these sting operations." United States v. Washington, No. CRIM.A. 13-171-2, 2014 WL 2959493, at *7 (E.D. Pa. June 30, 2014). While "identifying the class of [similarly situated] individuals is a . . . burdensome endeavor," see Paxton, 2014 WL 1648746, at *4, Armstrong requires that Defendants make this showing in order to obtain discovery on a selective enforcement claim. The Paxton court did not require the defendants to demonstrate that similarly situated whites were not targeted for sting operations.

Paxton also ignores the requirement that, in order to make the necessary showing of discriminatory intent, "a defendant must produce some evidence that 'the decision makers in his case acted with discriminatory purpose.'" Barnes, 532 F. Supp. 2d at 637 (quoting McCleskey, 481 U.S. at 292) (emphasis in Barnes). Defendants cannot rely entirely on statistical evidence to show discriminatory intent. "Rather, a claimant must present 'sufficient non-statistical evidence to demonstrate discriminatory intent.'" Cousins, 2014 WL 5023485, at *5 and n.3 (quoting Chavez, 251 F.3d at 647-48) (declining to follow Paxton "in light of Chavez's rejection of the use of statistics as sole proof of constitutional violation in the selective-enforcement context").

Finally, "[i]n granting discovery, the Paxton court . . . noted that the government had already produced 'some of the same discovery materials sought in the instant case.'" Viera,

27

2015 WL 3833797, at *3 n.10 (quoting Paxton, 2014 WL 1648746, at *5). Here, there is no such allegation.

Because Paxton does not properly apply the Armstrong standards, this Court does not find Paxton persuasive.

*     *     *     *

Defendants' statistics concerning the race of the defendants in the eighteen robbery sting cases prosecuted in this District since 2013 do not constitute "some evidence" of either discriminatory effect or discriminatory intent so as to warrant discovery on a selective enforcement claim.

## B.     Other Statistical Evidence

Defendants argue that the remaining statistical evidence they have submitted "justifies [their] discovery request, as it constitutes evidence of both discriminatory intent and effect in the enforcement policy in this district's phony-stash cases." (Def. Reply Br. (Dkt. No. 34) at 6-7) Defendants assert that "[t]he failure to target or prosecute white people is all the more troubling in light of the fact that the population of Manhattan and the Bronx is 30.7% white (nonhispanic), and the population of the entire Southern District of New York is whiter still." (Def. Br. (Dkt. No. 30) at 12-13 (citations omitted)) Defendants also point out that, despite the fact that (1) "offenders convicted under the Robbery Guideline . . . were 10.8% white," and (2) 23.8% of the population under custody in New York State Department of Corrections facilities is white, "not a single white person of whom the defense is aware was targeted for or prosecuted in a phony-stash case." (Id. at 13) Finally, Defendants cite Professor Kohler-Hausmann's findings concerning the percentage of white men ages 16 to 49 living in New York City who have prior New York State felony and violent felony convictions. They contend that "[t]hese statistics

28

constitute strong support for the defendants' claim that people of color were actively targeted in this district's phony stash-cases and that similarly situated white people were not," and thus "they are compelling evidence of discriminatory purpose." (Def. Reply. Br. (Dkt. No. 34) at 11)

Defendants' statistical evidence does not, however, identify the relevant group of individuals who are "similarly situated" to the Defendants in this case. The fact that 10.8% of those sentenced under the Robbery Guidelines are white; that 23.8% of the population under custody in New York State is white; that 8.8% of white males ages 16 to 49 living in New York City have prior New York State felony convictions; and that 7.5% of white males in that age group have violent felony convictions reveals nothing about "white people who could have been targeted or prosecuted [for sting operations] but were not." See id. at 9.

Defendants argue that it is impossible to identify similarly situated white individuals who were not targeted by law enforcement in sting operations, because the Government "says nothing about the selection criteria the DEA utilized to target prospective defendants for phony-stash cases in this district." (Id.) As discussed in detail above, however, the complaints in the Hobbs Act robbery sting cases cited by Defendants set forth the DEA's methodology, which is largely consistent over the eighteen cases cited by Defendants. See Def. Br. (Dkt. No. 30), Ex. C; Cmplt. (Dkt. No. 1). Generally, the DEA's methodology is as follows:

    (1) a cooperating witness or confidential informant who has proven reliable in the past tells a DEA agent about an individual who has experience in robbing drug dealers;

    (2) the cooperating witness or confidential informant meets with the identified individual at the direction of the DEA;

    (3) the individual expresses interest in robbing drug dealers and recruits others to help him; and

    (4) tape recordings of meetings and other evidence confirm the informant's account that the individual initially approached was pre-disposed to rob drug dealers.

Accordingly, the DEA's investigative focus was not assigned randomly, or on the basis of race, but instead was the result of information – from sources who had previously been proven reliable – about particular individuals who had robbed drug dealers in the past.  There is no evidence that any white person who had been sentenced under the Robbery Guidelines, or who had served time in a New York state prison for a violent felony, ever told a DEA informant about past involvement in robbing drug dealers but was not targeted for a sting operation.

Professor Kohler-Hausmann's declaration likewise does not constitute evidence that the DEA treated Defendants differently from similarly situated white individuals.  As an initial matter, to the extent that the professor's study relies on the race of all 95 defendants in the eighteen robbery sting cases, it is seriously flawed.  As discussed above, no DEA agent or informant approached 76 of these defendants; they were, instead, recruited by a co-conspirator.  Relying on the race of these 76 defendants for purposes of demonstrating the DEA's alleged discriminatory intent is thus entirely misguided.

Professor Kohler-Hausmann's assumption that the relevant group of "similarly situated individuals" is white males who have felony or violent felony convictions, see Def. Reply Br. (Dkt. No. 34), Ex. A ¶¶ 7, 9-10, is likewise misguided.  Felony offenses in New York State include a host of crimes that involve no violence, and there is no reason to believe that every felon in New York State would be pre-disposed to rob drug dealers.  Even the "violent felony" category is overbroad, because it includes, inter alia, sexual offenders.[12]  Such individuals are not similarly situated to Defendants.

---

[12]  In determining what crimes constitute "violent felonies," Kohler-Hausmann "used the same definition of 'violent felony' as that used by the New York State Department of Criminal Justice Services," which includes "all charges listed under N.Y. Penal Law § 70.02 and the Class A felonies of murder, arson, and kidnapping."  (Id. at 3 n.2 (emphasis in original))  Under New York Penal Law § 70.02, the term "violent felonies" includes such offenses as sexual abuse,

Moreover, it would not be reasonable for the DEA to target a person convicted of, for example, embezzlement or a sexual crime for involvement in a sting operation relating to robbing drug dealers.  Instead, as discussed above, the relevant comparison group is white individuals who DEA cooperating witnesses or informants reported as having prior experience with robbing drug dealers, or at least with armed robberies and drug dealing.  There is no evidence showing that the DEA decision makers in this case – or the DEA New York Office as a whole – could have targeted white individuals with such experience, but chose not to.  "Without presenting evidence that similarly situated individuals were not targeted for these sting operations, Defendant[s] cannot meet Armstrong's rigorous standard to obtain discovery." Washington, 2014 WL 2959493, at *7.  Because Defendants' statistical evidence does not meet this standard, Defendants have not satisfied Armstrong's requirement that they present "some evidence" of discriminatory effect and discriminatory intent in order to obtain discovery.

C.      **Race-Specific References in DEA Recordings**

Defendants argue that the race-related comments made by the DEA confidential informant in Terry constitute "compelling evidence that the DEA actively targeted people of color in the phony-stash cases." (Def. Reply Br. (Dkt. No. 30) at 12)  The remarks of the informant in Terry are not probative of whether the DEA decision-makers involved in this case acted with discriminatory intent, however.

The Government has represented that the "confidential informant [in Terry] had nothing to do with [the instant] case; it was a different DEA group, [and] a different lead agent." (Tr. (Dkt. No. 47) at 48-49)  Defendants acknowledge that the "decision makers [in the instant

---

criminal sexual acts, reckless assault of a child, menacing a police or peace officer, stalking, incest, and hindering prosecution of terrorism.  N.Y. Penal Law § 70.02.

case] are, in the main, the DEA agents who initiate[d] and supervised these investigations" – i.e. "Agent Riley [– the DEA agent who swore out the Complaint –] and his supervisor." (Id. at 32-33) Defendants concede that they are "[not] aware of a connection between Agent Riley and [the] informant in the Terry case." (Id. at 33) Accordingly, the fact that the DEA informant in Terry made race-related comments is irrelevant to whether the decision-makers in the instant case acted with discriminatory intent.

Indeed, there is no evidence that Agent Riley or his supervisor acted with discriminatory intent in targeting Defendants. Defendants concede that they have no "direct evidence" that "an informant ever told Agent Riley or his supervisor about a white person who had robbed drug dealers or who might be interested in robbing drug dealers, and that Agent Riley or his supervisor indicated that they were[ not] interested in pursuing that person." (Id. at 33-34) Defendants also admit that they have no "direct evidence" that "Agent Riley or his supervisor instructed informants that the DEA was only interested in targeting non-white people who robbed drug dealers or might be interested in robbing drug dealers." (Id. at 34-35)

Defendants argue that this Court may rely on "circumstantial or statistical evidence" to demonstrate discriminatory intent, see Def. Reply Br. (Dkt. No. 34) at 5-6 (internal quotation marks and citation omitted)), and the Court recognizes that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Village of Arlington Heights v. Metro. Housing Development Corp., 429 U.S. 252, 266 (1977). However, "statistical proof normally must present a 'stark' pattern to be accepted as the sole proof of discriminatory intent under the Constitution[.]" McCleskey, 481 U.S. at 293-94 (citing Arlington Heights, 429 U.S. at 266). Here, the statistical analysis is deeply flawed. Arguments are premised on the fact that 95

32

non-white individuals were arrested in robbery sting cases, when only nineteen were approached by DEA informants or cooperating witnesses. Those who have committed non-violent felonies and violent felonies that are not comparable to robbery are treated as similarly situated.

There is no direct evidence of discriminatory intent, and the statistical evidence does not show a "stark" pattern consistent with a discriminatory purpose.

## CONCLUSION

Defendants have not proffered "some evidence" of discriminatory effect and discriminatory intent so as to warrant discovery on their selective enforcement claim. Accordingly, their motion to compel is denied. The Clerk of Court is respectfully directed to terminate the motion (Dkt. No. 28).

Dated: New York, New York
August 7, 2015

SO ORDERED.

Paul G. Gardephe
United States District Judge

33